312 November 27, 2015 No. 50

IN THE SUPREME COURT OF THE
STATE OF OREGON

Nik BLOSSER,
*Petitioner,*

*v.*

Ellen F. ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(S063528 (Control))

Paul R. ROMAIN,
*Petitioner,*

*v.*

Ellen F. ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(S063532)

En Banc

On petition to review ballot title first filed September 3, 2015; considered and under advisement November 3, 2015.

Steven C. Berman, of Stoll Stoll Berne Lokting & Shlachter, PC, Portland, filed the petition and reply for petitioner Blosser.

Paul R. Romain, The Romain Group, LLC, Portland, filed the petition and reply for petitioner Romain.

Matthew J. Lysne, Assistant Attorney General, Salem, filed the answering memorandum for respondent. With him on the memorandum were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

BALDWIN, J.

The ballot title is referred to the Attorney General for modification.

**BALDWIN, J.**

In these consolidated cases, petitioners seek review of the Attorney General's certified ballot title for Initiative Petition 46 (2016) (IP 46), contending that the caption, the "yes" result statement, and the summary do not comply with requirements set out in ORS 250.035(2). We review the certified ballot title to determine whether it substantially complies with those requirements. *See* ORS 250.085(5) (setting out that standard). For the reasons explained below, we refer the ballot title to the Attorney General for modification of the caption, the "yes" result statement, and the summary.

IP 46, which is appended to this opinion, is an alternative proposal to Initiative Petition 45 (2016) (IP 45). These same petitioners have challenged the certified ballot title for that initiative petition, addressed in a separate opinion issued this day. *See [Blosser/Romain v. Rosenblum (IP 45)](#)*, 358 Or 295, ___ P3d ___ (2015) (referring certified ballot title for IP 45 to Attorney General for modification of caption and "yes" result statement). Like IP 45, IP 46 is a proposed statute that would amend aspects of a bill that the legislature enacted during the 2015 legislative session, Senate Bill (SB) 324 (2015), Or Laws 2015, ch 4. In *Blosser/Romain (IP 45)*, we summarized SB 324 as follows:

> "SB 324 made changes to a 2009 state law that permitted the Oregon Environmental Quality Commission (EQC) to adopt standards and requirements to reduce greenhouse gas emissions, and to adopt low carbon fuel standards for gasoline, diesel, and alternative fuels, as well as a schedule to reduce by 2020 the average amount of greenhouse gas emissions by 10 percent below 2010 levels. Or Laws 2009, ch 754, §§ 3(2), 6(2)(a), 6(2)(b). SB 324 changed the EQC's general permissive authority to adopt low carbon fuel standards to a directive, but left in place the EQC's permissive authority to adopt a schedule for reducing greenhouse gas emissions, newly extended to 2025. Or Laws 2015, ch 4, § 3(2)(a), 3(2)(b)(A). SB 324 further directed the EQC to adopt rules to manage and contain the cost of compliance with the standards, expressly permitting alternative compliance by obtaining and trading credits for fuels used as substitutes for gasoline or diesel. *Id.* § 3(2)(d)."

*Blosser/Romain (IP 45)*, 358 Or at ___.

IP 46 would change parts of the original 2009 law and SB 324, repeating some—but not all—of the changes contained in IP 45, and making other changes. *See Blosser/Romain (IP 45)*, 358 Or at ___ (describing changes that IP 45 would make to 2009 law and SB 324). As with IP 45, IP 46 would limit application of the state's low carbon fuel standards to blended liquid fuels. IP 46, § 1(1)(b). Also as with IP 45, IP 46 bases its definition of "low carbon fuel standards" on fuels "available in commercial quantities" in Oregon, expressly defining that phrase as alternative fuels "actually *** available in this state in sufficient quantities for all persons who import gasoline or diesel to comply with the standards." *Id.* § 1(1)(d). Further, "[a]s a means for managing and containing the costs of compliance with the standards," IP 46 would require the EQC to adopt rules for blending liquid fuels. Those rules would be subject to a restriction on the amount of ethanol or biodiesel that may be used in creating blended fuels and also to a prohibition against requiring the blending of any low carbon intensity fuel that is more expensive than the gasoline or diesel into which it is blended. *Id.* § 1(2)(c).

Finally, again as with IP 45, IP 46 would eliminate the cost-containment provision set out SB 324, which, in addition to expressly requiring the EQC to adopt cost-containment rules, also permits alternative compliance with the standards by obtaining and trading fuel credits. *Id.* § 1(2) (eliminating paragraph (d) from SB 324, Or Laws 2015, ch 4, § 3(2)(d)). IP 46 would replace that provision with a new provision that requires the EQC to notify all Oregon gasoline and diesel fuel importers when it has determined that any alternative fuel is "available in commercial quantities." *Id.* § 1(2)(d). Unlike IP 45, however, IP 46 further provides that any person required to blend fuels under IP 46 may contest the EQC's finding of commercial availability in the same manner provided for challenging the adoption of an administrative rule. IP 46, § 1(2)(d); *see* ORS 183.400 (validity of any rule may be determined upon petition for judicial review to court of appeals); ORS 183.497 (court in rules challenge proceeding may award attorney fees to prevailing petitioner).

The Attorney General drafted a ballot title for IP 46, ORS 250.065(3), and the Secretary of State circulated that title for public comment, ORS 250.067(1). After receiving comments, the Attorney General modified its draft ballot title, ORS 250.067(2)(a), and certified the following ballot title to the Secretary of State:

"**Restricts low carbon fuel standards to requiring blends of gasoline/diesel with commercially available fuels**

"**Result of 'Yes' Vote:**   'Yes' vote restricts low carbon fuel standards to requiring blending gasoline or diesel with commercially available liquid fuels; eliminates fuel credit system for satisfying standards.

"**Result of 'No' Vote:**   'No' vote retains low carbon fuel standards for liquid, non-liquid transportation fuels; standards allow obtaining fuel credits to satisfy standards, require rules to control costs.

"**Summary:**   Currently, Environmental Quality Commission sets low carbon fuel standards for reducing average greenhouse gas emissions from gasoline, diesel, and other transportation fuels, including non-liquid fuels. Commission currently must adopt rules to control costs, must allow fuel distributors to meet standards by purchasing credits from others whose products exceed required standards. Measure restricts low carbon fuel standards to apply only to blending gasoline and diesel with other liquid fuels, making standards inapplicable to other types of fuels and eliminating the credit system. Measure further provides that adopted standards cannot require carbon reductions unless low carbon fuel needed to meet the blending requirements is 'available in commercial quantities' (defined) and costs no more than the gasoline or diesel into which it is blended. Other provisions."

Petitioners are electors who timely submitted comments about the Attorney General's draft ballot title and who now are dissatisfied with the certified ballot title, ORS 250.085(2). Petitioner Blosser challenges the caption, the "yes" result statement, and the summary, including components added after the comment period ended. *See* ORS 250.085(6) (permitting Supreme Court consideration of such arguments). Petitioner Romain also challenges the caption

and the summary, as well as the "no" result statement, consistently with his earlier comments.

We begin with petitioner Romain's challenge to the caption. As with IP 45, petitioner Romain argues that, as part of setting out the subject matter of IP 46, the caption should mention the elimination of the ability to obtain and trade fuel credits as a means of alternatively complying with low carbon fuel standards. For the reasons set out in *Blosser/Romain (IP 45)*, 358 Or at ___, we agree and refer the caption to the Attorney General for modification. *See* ORS 250.035(2)(a) (caption limited to 15 words and must "reasonably identif[y] the subject matter" of proposed measure); *Whitsett v. Kroger*, 348 Or 243, 247, 230 P3d 545 (2010) ("subject matter" refers to "actual major effect" or, if more than one, all such effects within limit of word count).

Petitioner Blosser also challenges the caption, arguing that it should refer to the provision of IP 46 that permits any person required to blend fuels to contest an EQC finding that alternative fuels are "available in commercial quantities," IP 46, § 1(2)(d), by filing an administrative action similar to an administrative rules challenge. Petitioner Blosser relies on *Greenberg v. Myers*, 340 Or 65, 70-72, 127 P3d 1192 (2006), and other cases for the proposition that voters must be notified when a proposed measure provides or creates a cause of action. The Attorney General responds that the administrative action provision is not an actual major effect that must be mentioned in the caption.[1]

Petitioner Blosser is correct that, to accurately describe an actual effect of the proposed measure at issue, a caption appropriately may or even perhaps should refer to a new authorization of legal action. As illustrated by *Greenberg*, however, the assessment whether to include such a reference may depend on the nature and complexity of the measure, as well as the nature of the new authorization, given the 15-word limit set out in ORS 250.035(2)(a). *See*

---

[1] In that regard, the Attorney General notes that existing law provides a mechanism for challenging agency actions in other than a contested case, ORS 183.484, and argues that the administrative action provision set out in IP 46 is, "at most," a substitute for that general remedy.

340 Or at 70-72 (measure at issue incorporated multi-part enforcement scheme including new forms of liability that "would enact major changes to Oregon law that likely would be significant to the voting public"). Given the 15-word limit, together with the complexity of the key provisions of IP 46 that change the nature of the low carbon fuel standards and compliance with those standards, and the similarity of its administrative action provision to existing remedies, we conclude that the caption was not required to refer to the provision of IP 46 that authorizes administrative action to challenge an EQC commercial availability finding. As explained below, however, we agree with petitioner Blosser that the summary should refer to that provision.

Turning to the "yes" result statement, petitioner Blosser raises a similar challenge to use of the words "commercially available" that he raised as to IP 45—that is, that those words are misleading given the elaboration in IP 46 as to the meaning of the phrase "available in commercial quantities." *See Blosser/Romain (IP 45)*, 358 Or at ___ (describing challenge, in light of express definition of "available in commercial quantities," IP 45, § 1(4), including cost and other restrictions); *compare* IP 46, § 1(2)(c)(B) (rules for blending liquid fuels "available in commercial quantities" may not require blending of alternative fuel more expensive than gasoline or diesel fuel). As in *Blosser/Romain (IP 45)*, we agree with petitioner Blosser that, without referring to the express "expens[e]" limitation that applies to any requirement under IP 46 to blend alternative fuels with gasoline or diesel, IP 46, § 1(2)(c)(B), the words "commercially available" in the "yes" result statement are misleading and the statement therefore must be modified. *See* ORS 250.035(2)(b) ("yes" result statement must set out simple and understandable statement of not more than 25 words that describes result if measure is approved).[2]

---

[2] We note that the Attorney General also used the words "commercially available" in the caption for IP 46, although she did not do so in the caption for IP 45. *Blosser/Romain (IP 45)*, 358 Or at ___. In *Blosser/Romain (IP 45)*, petitioner Romain argued that the caption should include a reference to commercial availability, but petitioner Blosser countered that such a reference would be misleading, and we agreed with petitioner Blosser. *Id.* at ___. As to IP 46, however, no party challenges the Attorney General's inclusion of the words "commercially available" in the caption.

Petitioner Blosser also argues, as he did with the caption, that the "yes" result statement should notify voters that IP 46 authorizes legal action by way of an administrative challenge. As with the caption, in light of the 25-word limit on the "yes" result statement and the complexity of the key provisions of IP 46 already noted in the "yes" result statement, we conclude that that statement was not required to include a reference to the administrative challenge provision.

Next, petitioner Blosser argues that the summary should notify voters that IP 46 authorizes legal action, in the form of an administrative challenge by any person required to blend fuels to an EQC finding of commercial availability, potentially including prevailing party attorney fee awards. Although we disagreed above with petitioner Blosser's arguments that the caption and the "yes" result statement must refer to that provision, we agree that the express authorization in IP 46 to challenge an EQC determination on commercial availability by administrative action is a major effect that should be mentioned in the summary. *See generally Wilkeson v. Myers*, 329 Or 540, 546, 992 P2d 456 (1999) (new enforcement provision in proposed measure would enact significant change to current law); *Mabon v. Kulongoski*, 324 Or 315, 319-20, 925 P2d 1234 (1996) (general standing provision qualified as part of subject matter of measure).[3]

Finally, both petitioners raise other challenges to the summary, and petitioner Romain raises an additional challenge to the "no" result statement, ORS 250.035(2)(c), that are similar to challenges that they raised—and we rejected—as to IP 45. *Blosser/Romain (IP 45)*, 358 Or at ___, ___. We similarly reject them here without further discussion.

We refer the ballot title for IP 46 to the Attorney General for modification of the caption, the "yes" result statement, and the summary, as described in this opinion.

The ballot title is referred for modification.

_____

[3] In modifying the summary in that regard, the Attorney General should consider whether, within the 125-word limit, the summary also should refer to the potential availability of attorney fees. *See Novick/Crew v. Myers*, 337 Or 568, 574, 100 P3d 1064 (2004) (noting word limit as consideration whether Attorney General must include similar detail in summary).

APPENDIX

Relating to transportation fuel cost containment.

**Be It Enacted by the People of the State of Oregon:**

**Section 1.**  Section 6, chapter 754, Oregon Laws 2009, as amended by Section 3, chapter 4, Oregon Laws 2015, is amended to read:

**Sec. 6.**  (1)  As used in this section:

(a)  "Greenhouse gas" has the meaning given that term in ORS 468A.210.

(b)  "Low carbon fuel standards" means standards for the reduction of greenhouse gas emissions [*on average, per unit of fuel energy*] **by the blending of liquid fuel available in commercial quantities in this state**.

(c)  "Motor vehicle" has the meaning given that term in ORS 801.360.

**(d) "Available in commercial quantities" means that the fuel must actually be available in this state in sufficient quantities for all persons who import gasoline or diesel to comply with the standards.**

(2)(a)  The Environmental Quality Commission shall adopt by rule low carbon fuel standards for gasoline, diesel and **liquid** fuels used as substitutes for gasoline and diesel.

(b)  The commission may adopt the following related to the standards, including but not limited to:

(A)  A schedule to phase in implementation of the standards in a manner that reduces the average amount of greenhouse gas emissions per unit of fuel energy of the fuels by 10 percent below 2010 levels by the year 2025 or by a later date if the commission determines that an extension is appropriate to implement the standards;

(B)  Standards for greenhouse gas emissions attributable to the fuels throughout their lifecycles, including by not limited to emissions from the production, storage,

transportation and combustion of the fuels and from changes in land use associated with the fuels;

(C) Provisions allowing the use of all types of **liquid** low carbon fuels to meet the low carbon fuel standards [,*including but not limited to biofuels, biogas, natural gas, liquefied petroleum gas, gasoline, diesel, hydrogen and electricity*];

(D) Standards for the issuance of deferrals, established with adequate lead time, as necessary to ensure adequate fuel supplies;

(E) Exemptions for fuels that are used in volumes below thresholds established by the commission; **and**

(F) Standards, specifications, testing requirements and other measures as needed to ensure the quality of fuels produced in accordance with the low carbon fuel standards, including but not limited to the requirements of ORS 646.910 to 646.923 and administrative rules adopted by the State Department of Agriculture for motor fuel quality**.** [*and*]

[*(G) Adjustments to the amounts of greenhouse gas emissions per unit of fuel energy assigned to fuels for combustion and drive train efficiency.*]

[*(c) Before adopting standards under this section, the commission shall consider the low carbon fuels standards of other states, including but not limited to Washington, for the purpose of determining schedules and goals for the reduction of the average amount of greenhouse gas emissions per unit of fuel energy and the default values for these reductions for applicable fuels.*]

**(c) As a means for managing and containing the costs of compliance with the standards, the commission shall adopt by rule provisions for blending liquid fuels available in commercial quantities in this state. Provisions adopted under this subparagraph may not:**

**(A) Require that any person who imports gasoline or diesel fuel blends into that fuel more**

**ethanol or biodiesel than required by ORS 646.913 and 646.922; or**

**(B)   Provide for or require that any person who imports gasoline or diesel fuel blend into that fuel any alternative fuel that is more expensive than the gasoline or diesel fuel into which it is blended.**

**(d)   The commission shall notify all persons who import gasoline or diesel fuel into this state when it has determined that any liquid fuel used as a substitute for gasoline or diesel is available in commercial quantities in this state. Any person required to blend that substitute fuel may contest the finding of commercial availability in the manner provided for challenging administrative rule adoption.**

[*(d)   The commission shall adopt by rule provisions for managing and containing the costs of compliance with the standards, including but not limited to provisions to facilitate compliance with the standards by ensuring that persons may obtain credits for fuels used as substitutes for gasoline or diesel and by creating opportunities for persons to trade credits.*]

(e)   The commission shall exempt from the standards any person who imports in a calendar year less than 500,000 gallons of gasoline and diesel fuel, in total. Any fuel imported by persons that are related or share common ownership or control shall be aggregated together to determine whether a person is exempt under the paragraph.

(f)(A)   The commission by rule shall prohibit fuels that contain biodiesel from being considered an alternative fuel under these standards unless the fuel meets the following standards:

(i)   Fuel that consists entirely of biodiesel, designated by B100, shall comply with ASTM D 6751 and shall have an oxidation stability induction period of not less than eight hours as determined by the test method described in European standard EN 15751; and

(ii)   Fuel that consists of a blend of diesel fuel and between 6 and 20 volume percent biodiesel, and designated

as biodiesel blends B6 to B20, shall comply with ASTM D 7467 and shall have an oxidation stability induction period of not less than 20 hours as determined by the test method described in European standard EN 15751.

(B)   The commission may adopt rules different from those required under subparagraph (A) of this paragraph if an ASTM or EN standard applicable to biodiesel is approved or amended after March 12, 2015, or if the commission finds that different rules are necessary due to changes in technology or fuel testing or production methods.

(C)   As used in this subsection, "biodiesel" means a motor vehicle fuel consisting of mono-alkyl esters of long chain fatty acids derived from vegetable oils, animal fats or other nonpetroleum resources, not including palm oil.

**(g)   The commission may not differentiate among crude oils in determining the lifecycle carbon intensity value for gasoline and diesel.**

(3)   In adopting rules under this section, the Environmental Quality Commission shall evaluate:

(a)   Safety, feasibility, net reduction of greenhouse gas emissions and cost-effectiveness;

(b)   Potential adverse impacts to public health and the environment, including but not limited to air quality, water quality and the generation and disposal of waste in this state;

(c)   Flexible implementation approaches to minimize compliance costs; and

(d)   Technical and economic studies of comparable greenhouse gas emission reduction measures implemented in other states and any other studies as determined by the commission.

(4)(a)   The provisions of this section do not apply to fuel that is demonstrated to have been used in any of the following:

(A)   Motor vehicle registered as farm vehicle under the provisions of ORS 805.300.

(B)   Farm tractors, as defined in ORS 801.265.

(C)   Implements of husbandry, as defined in ORS 801.310.

(D)   Motor trucks, as defined in ORS 801.355, used primarily to transport logs.

(E)   Motor vehicles that are not designed primarily to transport persons or property, that are operated on highways only incidentally, and that are used primarily for construction work.

(F)   Watercraft.

(G)   Railroad locomotives.

(b)   The Environmental Quality Commission shall adopt by rule standards for persons to qualify for the exemptions provided in this subsection.