No. 49          November 27, 2015          295

IN THE SUPREME COURT OF THE
STATE OF OREGON

Nik BLOSSER,
*Petitioner,*

*v.*

Ellen F. ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(S063527 (Control))

Paul R. ROMAIN,
*Petitioner,*

*v.*

Ellen F. ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(S063531)

En Banc

On petition to review ballot title filed September 3, 2015; considered and under advisement November 3, 2015.

Steven C. Berman, Stoll Stoll Berne Lokting & Shlachter, PC, Portland, filed the petition and reply for petitioner Blosser.

Paul R. Romain, The Romain Group, LLC, Portland, filed the petition and reply for petitioner Romain.

Matthew J. Lysne, Assistant Attorney General, Salem, filed the answering memorandum for respondent. With him on the memorandum were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

BALDWIN, J.

The ballot title is referred to the Attorney General for modification.

**BALDWIN, J.**

In these consolidated cases, petitioners seek review of the Attorney General's certified ballot title for Initiative Petition 45 (2016) (IP 45), contending that the caption, the "yes" and "no" result statements, and the summary do not comply with requirements set out in ORS 250.035(2). We review the certified ballot title to determine whether it substantially complies with those requirements. *See* ORS 250.085(5) (setting out that standard). For the reasons explained below, we refer the ballot title to the Attorney General for modification of the caption and the "yes" result statement.

IP 45, which is appended to this opinion, is a proposed statute that would amend aspects of a bill that the legislature enacted during the 2015 legislative session, Senate Bill (SB) 324 (2015), Or Laws 2015, ch 4. SB 324 made changes to a 2009 state law that permitted the Oregon Environmental Quality Commission (EQC) to adopt standards and requirements to reduce greenhouse gas emissions, and to adopt low carbon fuel standards for gasoline, diesel, and alternative fuels, as well as a schedule to reduce by 2020 the average amount of greenhouse gas emissions by 10 percent below 2010 levels. Or Laws 2009, ch 754, §§ 3(2), 6(2)(a), 6(2)(b). SB 324 changed the EQC's general permissive authority to adopt low carbon fuel standards to a directive, but left in place the EQC's permissive authority to adopt a schedule for reducing greenhouse gas emissions, newly extended to 2025. Or Laws 2015, ch 4, § 3(2)(a), 3(2)(b)(A). SB 324 further directed the EQC to adopt rules to manage and contain the cost of compliance with the standards, expressly permitting alternative compliance by obtaining and trading credits for fuels used as substitutes for gasoline or diesel. *Id*. § 3(2)(d).

IP 45 would change parts of the original 2009 law and SB 324. First, IP 45 would limit application of the state's low carbon fuel standards to blended liquid fuels. IP 45, § 1(1)(b). IP 45 further bases its definition of "low carbon fuel standards" on the blending of liquid fuel "available in commercial quantities" in Oregon and provides that its "carbon intensity" reduction adjustments can occur only if the EQC

determines that "sufficient" low carbon intensity fuels are "available in commercial quantities." *Id.* § 1(1)(d), 1(2)(b)(A), 1(4).

Second, IP 45 would eliminate the EQC's permissive authority to adopt a schedule to reduce greenhouse gas emissions by 10 percent by 2025, replacing that provision with a directive to adopt a schedule to phase in a five-percent carbon intensity reduction for gasoline and diesel. *Id.* § 1(1)(b), 1(2)(b)(A). That schedule reduction under IP 45, as well as the development of low carbon fuel standards, would require the EQC to assess whether alternative liquid fuels are "available in commercial quantities." *Id.* § 1(1)(b), 1(4). That assessment, in turn, relies on a particularly described analysis, including whether low carbon intensity fuels are "cost competitive;" that is, whether such fuels are available at a cost less than or equal to "base petroleum products" (gasoline and diesel). *Id.* § 1(4)(b). The EQC's "available in commercial quantities" analysis also would incorporate the following determinations: (1) whether low carbon intensity fuel facilities inside and outside Oregon are capable of providing such fuels in commercial quantities, depending on consideration of multiple factors, *id.* § 1(4)(a); (2) whether the infrastructure to distribute low carbon intensity fuels is sufficient, *id.* § 1(4)(c); and (3) whether sufficient commercially produced vehicles exist to utilize such fuels, *id.* § 1(4)(d).

Third, "[a]s a means for containing the costs of compliance with the standards," IP 45 would require the EQC to adopt rules for blending liquid fuels. Those rules would be subject to a restriction on the amount of ethanol or biodiesel that may be used in creating blended fuels and also to a prohibition against requiring the blending of any low carbon intensity fuel that is not available at an average retail cost equal to or less than gasoline or diesel. *Id.* § 1(2)(c).

Finally, IP 45 would eliminate the cost-containment provision of SB 324, which, in addition to expressly requiring the EQC to adopt cost-containment rules, also permits alternative compliance with the standards by obtaining and trading fuel credits. *Id.* § 1(2) (eliminating paragraph (d) from SB 324, Or Laws 2015, ch 4, § 3(2)(d)).

The Attorney General drafted a ballot title for IP 45, ORS 250.065(3), and the Secretary of State circulated that title for public comment, ORS 250.067(1). After receiving comments, the Attorney General modified its draft ballot title, ORS 250.067(2)(a), and certified the following ballot title to the Secretary of State:

**"Restricts low carbon fuel standards to requiring blending gasoline/diesel with other fuels; other limits**

**"Result of 'Yes' Vote:**  'Yes' vote limits low carbon fuel standards' carbon reduction requirements; restricts standards to requiring gasoline/diesel blends with commercially available fuels; eliminates fuel credit system.

**"Result of 'No' Vote:**  'No' vote retains low carbon fuel standards for liquid, non-liquid transportation fuels; standards allow obtaining fuel credits to satisfy standards, require rules to control costs.

**"Summary:**   Currently, Environmental Quality Commission sets low carbon fuel standards for gasoline, diesel, other fuels; may reduce average greenhouse gas emissions per unit of energy by 10% below 2010 levels by 2025. Commission must adopt rules to control costs, must allow compliance by obtaining credits from lower carbon fuel providers. Measure restricts low carbon fuel standards to requiring blending of gasoline or diesel with other liquid fuels; standards inapplicable to non-liquid fuels; eliminates credit system. Measure further provides that adopted standards cannot require carbon reductions greater than 5% from 2010 levels; cannot require any reductions unless low carbon fuel needed for blending requirements is 'available in commercial quantities' (defined), costs no more than the gasoline or diesel into which it is blended. Other provisions."

Petitioners are electors who timely submitted comments about the Attorney General's draft ballot title and who now are dissatisfied with the certified ballot title, ORS 250.085(2). Petitioner Blosser challenges aspects of the "yes" result statement and the summary added after the comment period ended. *See* ORS 250.085(6) (permitting Supreme Court consideration of such arguments). Petitioner Romain challenges all aspects of the ballot title, consistently with his earlier comments and adding challenges to aspects of the ballot title made after the comment period ended.

We begin with petitioner Romain's challenge to the caption. He argues that the caption is misleading because it addresses only the liquid fuels restriction in IP 45 and otherwise groups all the other significant changes into a single category, "other limits." In his view, the caption instead should separately highlight the elimination of fuel credits and the new requirement that alternative fuels be available in commercial quantities. The Attorney General responds that the subject matter of IP 45 is the "fundamental legal change in the scope and breadth of the low carbon fuel standards"—that is, the new limited application of the standards to blended liquid fuels only—and that the other components that petitioner Romain notes are part of that broader change that need not be included in the caption.

Under ORS 250.035(2)(a), the caption is limited to 15 words and must "reasonably identif[y] the subject matter" of IP 45—that is, its "actual major effect" or, if more than one major effect, all effects that can be described within the available word limit. *Lavey v. Kroger*, 350 Or 559, 563, 258 P3d 1194 (2011). We agree with petitioner Romain that the elimination of the fuel credits provision, which SB 324 enacted as a new, alternative means of complying with state low carbon fuel standards, is an actual major effect of IP 45 that should be noted in the caption. The elimination of that provision would eliminate both the ability of the EQC to create a state fuel credits program and the ability of regulated persons to alternatively comply with the EQC's standards by obtaining and trading fuel credits. The Attorney General therefore must modify the caption to refer to the elimination of fuel credits.[1]

Petitioner Romain further argues that the caption should specifically note the requirement that, before the low carbon fuel standards can apply, alternative fuels must be "available in commercial quantities." IP 45, § 1(2)(b)(A). Petitioner Blosser, however, asserts in his argument challenging the "yes" result statement that the short-hand

---

[1] By way of example, although the Attorney General potentially could draft the caption in many ways to comply with ORS 250.035(2)(a), one possible way would be: "Limits low carbon fuel standards to gasoline/diesel liquid blends; eliminates fuel credits; other limits."

phrase "commercially available," as used in the "yes" result statement is misleading standing alone and that additional words are needed to accurately convey the intended meaning of the phrase "available in commercial quantities," IP 45, § 1(2)(b)(A). For the reasons explained below addressing petitioner Blosser's challenge to the "yes" result statement, we disagree with petitioner Romain that the 15-word caption must separately describe the "available in commercial quantities" limitation in IP 45. Instead, we agree with the Attorney General that the caption's more general reference to "other limits" substantially complies with ORS 250.035(2)(a).

We turn to petitioner Blosser's challenge to the "yes" result statement, which focuses on the words "commercially available." As described earlier, IP 45 provides that its "carbon intensity" reduction adjustments can occur only if the EQC determines that "sufficient" low carbon intensity fuels to be blended with gasoline or diesel are "available in commercial quantities," and IP 45 similarly limits application of other provisions by use of the defined term "available in commercial quantities." IP 45, § 1(1)(d), 1(2)(b)(A), 1(4). The "yes" result statement describes those provisions using the phrase "restricts standards to requiring gasoline/diesel blends with *commercially available* fuels" (emphasis added). Petitioner Blosser contends that the shorthand reference "commercially available" is misleading: Electors would understand those words to describe low carbon intensity fuels that can be obtained for money in an open, legal marketplace, but IP 45 specifically defines "available in commercial quantities" to mean only such fuels available under certain cost and other restrictions, and thus would exclude fuels that otherwise, in more common parlance, would be considered to be commercially available.[2] The Attorney

---

[2] As noted, IP 45 ties the concept of low carbon intensity fuels "available in commercial quantities" to the cost of those fuels; only those fuels available at a cost that is equal to or less than the cost of base petroleum products qualify for blending with gasoline or diesel. IP 45, § 1(4)(b). Additionally, if infrastructure is insufficient to distribute low carbon fuels as described in IP 45, or if insufficient commercially produced vehicles are in existence that utilize such fuels, then those fuels "will not be considered available in commercial quantities." *Id.* § 1(4)(c), 1(d). And, as part of determining availability in commercial quantities, IP 45 requires the EQC to apply a multi-factored analysis to determine the capability of low carbon intensity fuel facilities. *See* IP 45 § 1(4)(a)(A)-(J) (setting out factors).

General responds that the words "commercially available" in the "yes" result statement, when read in context with the rest of the accompanying phrase, accurately and broadly identify IP 45's "most predominant legal restriction" regarding the potential blending of alternative fuels if IP 45 is approved—that is, its requirement that the alternative fuels be available in sufficient quantities.

Under ORS 250.035(2)(b), the "yes" result statement must set out "[a] simple and understandable statement of not more than 25 words that describes the result" if the measure is approved. We agree with petitioner Blosser that the "yes" result statement does not substantially comply with that requirement. As petitioner Blosser notes, IP 45 defines the term "available in commercial quantities" as subject to several restrictions—most significantly, an express cost limitation, such that only low carbon intensity fuels that are available at a cost equal to or less than the cost of those base petroleum products may be blended with gasoline or diesel. Without reference to that qualification, the words "commercially available" inaccurately—and thus, impermissibly—convey to voters that the updated standards under IP 45 would apply as long as the alternative fuels as described are available for purchase in the marketplace. *See Tauman v. Myers*, 343 Or 299, 302-04, 170 P3d 556 (2007) (demonstrating that term taken directly from proposed measure can impermissibly confuse voters if used in ballot title, when measure defines term differently from commonly understood meaning); *Sager v. Myers*, 328 Or 528, 531-33, 982 P2d 1104 (1999) (same).[3]

Petitioner Romain raises a different challenge to the "yes" result statement, arguing that the phrase "limits low carbon fuel standards' carbon reduction requirements" is inaccurate because, in operation, the 2009 law as

---

[3] The Attorney General argues that *Tauman* is inapposite because the proposed measure in that case defined a commonly understood term in a uniquely broad manner, whereas IP 45 defines "available in commercial quantities" in a uniquely limited manner. *See* 343 Or at 302-03 (explaining broad definition of "charity" in proposed measure at issue, in context of addressing challenge to caption). *Tauman*, however, expressly focused on the "false impression" conveyed to voters about the scope of a term in the measure. *Id.* The Attorney General's "yes" result statement for IP 45 suffers from that same deficiency.

amended by SB 324 will not actually result in reduced carbon production, whereas IP 45 will result in some reduction. Whatever the merits of that argument as to the respective likely consequences of competing versions of the law, the text of IP 45 expressly changes various provisions of the 2009 law, as amended by SB 324, to limit the scope of current low carbon fuel standards in several respects. The identified phrase in the Attorney General's "yes" result statement accurately describes that text and therefore substantially complies with ORS 250.035(2)(b). Petitioner Romain's arguments are more properly directed toward ultimate efforts to persuade voters whether to enact IP 45. *See generally Rogers v. Roberts*, 300 Or 687, 692, 717 P2d 620 (1986) (ballot title should not include speculation as to result or consequence of proposed measures).

Turning to the "no" result statement, petitioner Romain contends that the phrase "require rules to control costs" is misleading. He first argues that that phrase incorrectly implies that IP 45 will eliminate current rules to control costs, when IP 45 actually retains a 2009 provision requiring the EQC to evaluate cost-effectiveness and to minimize the cost of compliance when adopting rules, Or Laws 2009, ch 754 § 6(3), and IP 45 otherwise requires the EQC to determine the cost and availability of alternative fuels as a condition precedent to reduced carbon intensity. He additionally argues that the phrase "require rules to control costs" misleadingly implies that the EQC rules adopted under the 2009 law (as amended by SB 324) will actually control costs; by contrast, in operation, IP 45—not current law—will control costs.

In response to petitioner Romain's first argument, the Attorney General correctly points out that, although IP 45 would retain the original 2009 provision about the EQC's evaluation of several factors in adopting rules, Or Laws 2009, ch 754 § 6(3), it nonetheless would eliminate an express provision from the 2009 law (as amended by SB 324), which requires the EQC to "adopt by rule provisions for managing and containing the costs of compliance with the [low carbon fuel intensity] standards," Or Laws 2015, ch 4, § 3(2)(d); *compare* IP 45, § 1(2)(c) (more limited provision, requiring adoption of rules about blending fuels that would serve

"[a]s a means for containing the costs of compliance with the standards"). Incorporating the phrase "require rules to control costs" in the "no" result statement accurately captures that statement of current law. *See* ORS 250.035(2)(c) ("no" result statement must describe, within 25 words, result if proposed measure is rejected). As to petitioner Roman's second argument, the Attorney General responds—and we agree—that that argument is more appropriately made to the voters.

Both petitioners raise various challenges to the summary. We have considered those challenges and conclude, without further discussion, that the summary substantially complies with the requirements of ORS 250.035(2)(d) (summary must contain concise and impartial statement not exceeding 125 words that summarizes measure and major effect).

We refer the ballot title for IP 45 to the Attorney General for modification of the caption and the "yes" result statement, as described in this opinion.

The ballot title is referred to the Attorney General for modification.

APPENDIX

Relating to transportation fuel cost containment.

**Be It Enacted by the People of the State of Oregon:**

**Section 1.**   Section 6, chapter 754, Oregon Laws 2009, as amended by Section 3, chapter 4, Oregon Laws 2015, is amended to read:

**Sec. 6.**   (1)   As used in this section:

(a)   "Greenhouse gas" has the meaning given that term in ORS 468A.210.

(b)   "Low carbon fuel standards" means standards for the reduction of greenhouse gas emission [*on average, per unit of fuel energy*] **by the blending of liquid fuel available in commercial quantities in this state**.

(c)   "Motor vehicle" has the meaning given that term in ORS 801.360.

**(d) "Available in commercial quantities" means that the liquid fuel must actually be available in the State of Oregon in sufficient quantities as determined pursuant to Section 4 of this section for all persons who import gasoline or diesel to comply with the standards.**

(2)(a)   The Environmental Quality Commission shall adopt by rule low carbon fuel standards for gasoline, diesel and **liquid** fuels used as substitutes for gasoline and diesel.

(b)   The commission **shall** [*may*] adopt the following related to the standards**.** [, including but not limited to:]

(A)   A schedule to phase in a **5% carbon intensity reduction for gasoline and diesel on average.** [*implementation of the standards in a manner that reduces the average amount of greenhouse gas emissions per unit of fuel energy of the fuels by 10 percent below 2010 levels by the year 2025 or by a later date if the commission determines that an extension is appropriate to implement the standards*]; **The schedule shall provide that, beginning January 1,**

**2016, the first reduction in carbon intensity ("C.I.") of gasoline and diesel will be 0.25% from a baseline of clear gasoline and diesel sold in Oregon during 2010. Further reductions in C.I. of Oregon liquid fuels will be implemented over time. The subsequent reductions, by percent, will be 0.5%, 1.0%, 1.5%, 2.5%, 3.5%, and 5%. These reductions shall be the average fuel reduction for all subject fuels sold in Oregon. The commission's rules shall provide that a C.I. reduction adjustment will be made no less than one year from the last reduction adjustment implemented. The commission's rules shall provide that a scheduled C.I. reduction adjustment shall not be made unless the commission conducts an analysis pursuant to section 4 of these sections and makes a determination that sufficient low C.I. biofuel blend stocks are available in commercial quantities.**

(B)   Standards for greenhouse gas emissions attributable to the fuels throughout their lifecycles, including b[ut] not limited to emissions from the production, storage, transportation and combustion of the fuels and from changes in land use associated with the fuels**.**[*;*]

(C)   Provisions allowing the use of all types of **liquid** low carbon fuels to meet the low carbon fuel standards [*,including but not limited to biofuels, biogas, natural gas, liquefied petroleum gas, gasoline, diesel, hydrogen and electricity*];

(D)   Standards for the issuance of deferrals, established with adequate lead time, as necessary to ensure adequate fuel supplies**.**[*;*]

(E)   Exemptions for fuels that are used in volumes below thresholds established by the commission**.**[*;*]

(F)   Standards, specifications, testing requirements and other measures as needed to ensure the quality of fuels produced in accordance with the low carbon fuel standards, including but not limited to the requirements of ORS 646.910 to 646.923 and administrative rules adopted by the State Department of Agriculture for motor fuel quality**.** [*and*]

[*(G) Adjustments to the amounts of greenhouse gas emissions per unit of fuel energy assigned to fuels for combustion and drive train efficiency.*]

[*(c) Before adopting standards under this section, the commission shall consider the low carbon fuels standards of other states, including but not limited to Washington, for the purpose of determining schedules and goals for the reduction of the average amount of greenhouse gas emissions per unit of fuel energy and the default values for these reductions for applicable fuels.*]

**(c) As a means for containing the costs of compliance with the standards, the commission shall adopt by rule provisions for blending liquid fuels available in commercial quantities in this state. Provisions adopted under this subparagraph may not:**

**(A) Require that any person who imports gasoline or diesel fuel blend into that fuel more ethanol or biodiesel than 10 percent ethanol (E-10) and 5 percent biodiesel (B-5); or**

**(B) Provide for or require that any person who imports gasoline or diesel fuel blend into that fuel any low C.I. fuel that is not available at average market retail costs equal to or less than the base gasoline or diesel.**

[*(d) The commission shall adopt by rule provisions for managing and containing the costs of compliance with the standards, including but not limited to provisions to facilitate compliance with the standards by ensuring that persons may obtain credits for fuels used as substitutes for gasoline or diesel and by creating opportunities for persons to trade credits.*]

[*(e)*]**(d)** The commission shall exempt from the standards any person who imports in a calendar year less than 500,000 gallons of gasoline and diesel fuel, in total. Any fuel imported by persons that are related or share common ownership or control shall be aggregated together to determine whether a person is exempt under this paragraph.

[(f)]**(e)**(A)   The commission by rule shall prohibit fuels that contain biodiesel from being considered an alternative fuel under these standards unless the fuel meets the following standards:

(I)   Fuel that consists entirely of biodiesel, designated by B100, shall comply with ASTM D 6751 and shall have an oxidation stability induction period of not less than eight hours as determined by the test method described in European standard EN 15751; and

(ii)   Fuel that consists of a blend of diesel fuel and between 6 and 20 volume percent biodiesel, and designated as biodiesel blends B6 to B20, shall comply with ASTM D 7467 and shall have an oxidation stability induction period of not less than 20 hours as determined by the test method described in European standard EN 15751.

(B)   The commission may adopt rules different from those required under subparagraph (A) of this paragraph if an ASTM or EN standard applicable to biodiesel is approved or amended after March 12, 2015, or if the commission finds that different rules are necessary due to changes in technology or fuel testing or production methods.

(C)   As used in this subsection, "biodiesel" means a motor vehicle fuel consisting of mono-alkyl esters of long chain fatty acids derived from vegetable oils, animal fats or other nonpetroleum resources, not including palm oil.

**(f)   The commission may not differentiate among crude oils in determining the life cycle carbon intensity value for gasoline and diesel.**

(3)   In adopting rules under this section, the Environmental Quality Commission shall evaluate:

(a)   Safety, feasibility, net reduction of greenhouse gas emissions and cost-effectiveness;

(b)   Potential adverse impacts to public health and the environment, including but not limited to air quality, water quality and the generation and disposal of waste in this state;

(c)   Flexible implementation approaches to minimize compliance costs; and

(d)   Technical and economic studies of comparable greenhouse gas emission reduction measures implemented in other states and any other studies as determined by the commission.

**(4)   The commission shall determine that there is a sufficient volume of low C.I. fuels available in commercial quantities in order to approve the next scheduled reduction adjustment. This determination shall be based upon the following consideration.**

**(a)   The commission will conduct an analysis to assess the capability of the low C.I. fuel facilities within and without the State of Oregon to provide low C.I. fuels available in commercial quantities. This analysis shall consider:**

**(A)   Design capacity in gallons per day.**

**(B)   Date of construction and completion.**

**(C)   Date that feedstock was first introduced to the process.**

**(D)   Date that commercial quantities of on-specification product was first produced. Planned or advertised dates will not be considered.**

**(E)   Highest utilization demonstrated in a consecutive three-month period (utilization is defined as production rate divided by design capacity, inclusive of downtime).**

**(F)   Percent of product that was produced on-specification, without reprocessing or blending during the period in Section 4(a)(E) of this section.**

**(G)   Duration, in days, of longest continuous period of plant operation.**

**(H)   Utilization during the last calendar year (production rate divided by design capacity, inclusive of downtime).**

**(I)   Percent of product that was produced on-specification without reprocessing or blending during the period in Section 4(a)(H) of this section.**

**(J)    Annual Production forecast for the next one to three years (high, medium, and low estimates) based on historic production and any technical issues to date. The commission shall include variations based on projected feedstock availability and any changes to feedstock being used in the process.**

**b.    The commission shall analyze whether available low C.I. fuels are cost competitive. If the fuels are not available at average market retail costs equal to or less than the base petroleum products, the low C.I. fuels will not be considered available in commercial quantities.**

**c.    The Commission shall conduct an analysis to determine the capability of the distribution system infrastructure (including retail sites) to handle the projected volumes and types of fuels. If insufficient to handle projected volumes and types of low C.I. fuels, the volume of fuels that would exceed the distribution system capacity will not be considered available in commercial quantities.**

**d.    The commission shall determine whether there are sufficient commercially produced vehicles able to utilize the low C.I. fuels following the scheduled reduction adjustment. If an insufficient number of such vehicles are able to utilize the low C.I. [f]uels following the scheduled reduction adjustment, the low C.I. fuels will not be considered available in commercial quantities.**

[*(4)*]**(5)**(a)    The provisions of this section do not apply to fuel that is demonstrated to have been used in any of the following:

(A)    Motor vehicle registered as farm vehicle under the provisions of ORS 805.300.

(B)    Farm tractors, as defined in ORS 801.265.

(C)    Implements of husbandry, as defined in ORS 801.310.

(D)    Motor trucks, as defined in ORS 801.355, used primarily to transport logs.

(E)   Motor vehicles that are not designed primarily to transport persons or property, that are operated on highways only incidentally, and that are used primarily for construction work.

(F)   Watercraft.

(G)   Railroad locomotives.

(b)   The Environmental Quality Commission shall adopt by rule standards for persons to qualify for the exemptions provided in this subsection.